### APPEAL OF PLYMOUTH COAL MINING CO.

Docket No. 4003.    Submitted November 7, 1925.    Decided March 10, 1926.

> Evidence respecting the value of a leasehold of coal lands paid in for stock of a corporation in 1905 examined and *held* to be sufficient to support a value equal to the par value of the stock issued therefor, both for the purposes of invested capital and deduction for exhaustion.

*Virgil Y. Moore* and *Andrew T. Smith, Esqs.*, for the taxpayer.
*E. C. Lake, Esq.*, for the Commissioner.

Before JAMES, LITTLETON, SMITH, and TRUSSELL.

This appeal is taken from the determination of deficiencies aggregating $11,237.73, asserted in a deficiency letter determining the taxpayer's liability for the years 1917 to 1920, inclusive, and finding deficiencies for the years 1918, $4,418.86; 1919, $3,257.63; 1920, $3,561.24; and an overassessment for the year 1917 in the amount of $1,847.34.

FINDINGS OF FACT.

The taxpayer is a corporation organized under the laws of Pennsylvania on February 8, 1905, by Roy A. Hatfield and his partner, a man named Hillis, who were at the time interested in coal-mining properties in Pennsylvania, for the purpose of mining and selling coal and manufacturing and selling coke. Its plant and leasehold are located in Portage Township, Cambria County, Pa. John C. Martin was the owner of about 5,000 acres of coal and timber lands in Cambria County. In 1903 he leased to William A. Price the "C" seam of coal on 660 acres of the above-mentioned tract of land. Price operated a coal mine thereon from the time the lease was acquired by him until December, 1904. Price had large business interests in New York, where he operated a fleet of barges. In the course of the operation of this business he became financially involved, and in December, 1904, he made efforts to secure money. While he was making efforts to secure money he met Hatfield, whom he knew to be interested in coal properties in Pennsylvania near his own. He offered to dispose of his interest in the mining property here under consideration if he could obtain an immediate cash

payment, and, as a result of these conversations, he finally agreed that he was willing to take $26,000 for all of his interest in the property.

Hatfield consulted with his counsel, who knew of Price's financial difficulties, and advised that it would not be safe to take an assignment of lease from Price under the circumstances. It was thereupon arranged between Hatfield, Price, and Martin that Price should surrender and agree to the cancellation of his lease, for which he was to receive $26,000 from Hatfield, and that Martin should give to Hatfield a new lease on the same coal properties. This plan was carried out and completed on or about December 23, 1904, when Hatfield and Hillis paid Price $26,000, and the new lease from Martin to Hatfield was made, and Hatfield at the same time purchased from Martin various properties, consisting of mules, harness, mine cars, etc., for which he paid Martin $6,017.60.

On January 12, 1905, an involuntary petition in bankruptcy was filed against Price by certain of his creditors in the District Court for the Eastern District of New York, and he was thereafter duly adjudged a bankrupt by said court.

Hatfield and Hillis organized the taxpayer with an authorized capital of $100,000. They subscribed for $10,000 of the stock in cash at par, $6,017.60 of which was paid to Hatfield for the mine property above described, and $55,000 of the stock was issued to themselves in consideration of the transfer of the leasehold to the taxpayer corporation. This transaction was made on February 24, 1905, according to the following resolution, as shown by the minutes of the taxpayer:

Resolved that Directors of the Company be instructed to purchase from Roy A. Hatfield all of his right, title and interest in and to the coal lease between John C. Martin, of the first part, and the said Roy A. Hatfield, of the second part, dated the 23rd day of December, 1904, covering certain property in the Township of Portage, in the County of Cambria, in the State of Pennsylvania, and all of his right, title and interest in and to the Bill of Sale made by the said John C. Martin to the said Roy A. Hatfield, bearing date the said 23rd day of December, 1904, selling to the said Roy A. Hatfield the goods and chattels therein described, and to obtain from the said Roy A. Hatfield a release from all claims and demands that he may have against the company by reason of the mining operations of the company hereafter carried on [on] the premises described in the said lease, and to issue in payment therefor 550 shares of the full paid capital stock of the Company, and to pay in cash to the said Roy A. Hatfield the sum of $6,017.60.

The " C " seam of coal which was covered by the leasehold on 660 acres was at the time of acquisition known to be continuous over the acreage and contained approximately 2,500,000 tons of recoverable coal. The mine which had been opened into the seam was what is known as a drift mine. This drift was upgrade into the coal, so that

the mine drained itself, and the loaded cars of coal could be carried from the working places to the mouth of the mine by force of gravity. The lease gave the lessee the privilege of cutting all timber necessary for the mine, not only on the tract under lease but also on all of the 5,000 acres of the John C. Martin land at that point. Under this privilege taxpayer secured all timber needed for the mine from 1905 until about 1923.

At the time of acquisition by the taxpayer the mine had reached its full development, a system of double entries having been driven 1,800 or 2,000 feet from the mouth of the mine, with cross entries and other developments providing ample working places to produce the mine's tonnage. A railroad siding had been built capable of accommodating 28 steel railroad cars. All buildings and machinery necessary to operate the property were in place and the mine was a going concern. The development which had been done on the property prior to acquisition by taxpayer had cost between $40,000 and $50,000.

In computing the taxpayer's invested capital for the taxable years 1918, 1919, and 1920, the Commissioner valued the plant and leasehold at $26,000, the amount paid to Price for the surrender of his lease. The taxpayer claimed that the plant and leasehold had a value of $55,000. This difference in value is the basis of the deficiencies determined by the Commissioner.

The Board finds that the actual cash value of the taxpayer's coal-land lease at the time paid in for stock was $55,000.

### OPINION.

Trussell: The negotiations between Price and Hatfield were had at a time when Price was experiencing financial embarrassments which culminated in his enforced bankruptcy a few weeks later. He was then striving to convert some of his interests into cash in order to avoid impending bankruptcy. For this purpose he was willing to and did offer to dispose of his interests in the mining property here in question for an amount of cash apparently not more than one-half of what he had expended in developing the mining property. Persons who acquire property under these circumstances and later organize a corporation for taking it over and managing it are, under the decisions of the Board in the *Appeals of The Markenheim Co.*, 1 B. T. A. 1240; *Pittsburgh Grinding Wheel Co.*, 2 B. T. A. 712, and *Cross Mountain Coal Co.*, 2 B. T. A. 587, entitled to have the fair cash market value of the property they acquire under such circumstances ascertained and allowed for the purposes of invested capital and exhaustion deductions.

Both Hatfield and Hillis, who organized the taxpayer corporation, were men of large experience in the operation of coal prop-

erties in Pennsylvania. They knew the value of such properties, and especially the cost of the early development of a new mining operation, and the record clearly discloses that when they placed the valuation of $55,000 upon this lease they undertook to give to it a conservative estimated value.

The record also contains the testimony of two disinterested witnesses, both of whom had been mine operators, and one of whom had been for many years a valuation expert in the employ of the Bethlehem Steel Co. and the Pittsburgh Coal Co. They were both familiar with the taxpayer's property and the improvements and development made thereon. Each of them testified that in his opinion the taxpayer's lease on February 24, 1905, was worth at least $75,000; that in arriving at such valuation he took into consideration the advantages of the drift-mine situation, the valuable timber rights, the cost of the development which had previously been made, and the recoverable tonnage then in sight.

The value of a leasehold of coal lands is at all times a question of fact, which must be determined in the light of the evidence produced. The record of this appeal convinces us that the taxpayer's claim of $55,000 is a conservative valuation, and we therefore find that the lease in question had, at the time paid in for stock, a value of not less than $55,000.

*Order of redetermination will be entered on 15 days' notice, under Rule 50.*